IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANDREW HARLEY SPEAKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 1:09-CV-1137-WSD |
| | ) | |
| U.S. DEPARTMENT OF HEALTH AND | ) | |
| HUMAN SERVICES CENTERS FOR | ) | |
| DISEASE CONTROL AND PREVENTION, | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED COMPLAINT FOR DAMAGES
## AND DEMAND FOR JURY TRIAL

COMES NOW Andrew Harley Speaker, Plaintiff in the above-captioned action and, per the Court's Minute entry of August 27, 2009 giving Plaintiff until September 16, 2009 to amend his Complaint (Doc. 20), hereby amends his original Complaint so as to now read as follows:

### INTRODUCTION

1.

This is an action for damages under the Privacy Act, 5 U.S.C. §552a, arising from a federal agency's intentional, unauthorized disclosure of Plaintiff's

confidential medical history contained within the system of records maintained by the Defendant. A private right of action is expressly conferred upon Plaintiff by 5 U.S.C. §552a(g)(1).

## JURISDICTION AND VENUE

2.

Jurisdiction is founded upon 28 U.S.C. §1331 and 5 U.S.C. §552a(g)(1).

3.

Venue is proper in this Court pursuant to 28 U.S.C. §1391 and 5 U.S.C. §552a(g)(5).

4.

All the parties herein are subject to the jurisdiction of the Court.

## PARTIES

5.

Plaintiff Andrew Harley Speaker (hereafter referred to as "Mr. Speaker") resides in Atlanta, Georgia within the geographical boundaries of the Atlanta Division of the Northern District of Georgia.

6.

Defendant U.S. Department of Health and Human Services Centers For Disease Control and Prevention (hereafter referred to as "the CDC") is an agency

of the United States government that maintains its offices at 1600 Clifton Road, Atlanta, Georgia 30333 within the geographical boundaries of the Atlanta Division of the Northern District of Georgia, and is subject to the jurisdiction of this Court.

7.

Pursuant to Rule 4(i) of the Federal Rules of Civil Procedure, Defendant CDC may be served as follows:

a)     By delivering a copy of the summons and complaint to the United States Attorney for the Northern District of Georgia, or to an assistant United States Attorney or clerical employee whom the United States Attorney has delegated for that purpose _or_ by sending a copy of the summons and complaint registered or certified mail to the civil-process clerk at the United States attorney's office (Rule 4(i)(2) and 4(i)(1)(A)); and

b)     By sending a copy of the summons and complaint by registered or certified mail to the Attorney General of the United States at Washington, D.C. (Rule 4(i)(1)(B)); and

c)     By mailing a copy of the summons and complaint by registered or certified mail to the CDC (Rule 4(i)(2)).

8.

Defendant has been properly served with the summons and complaint in this action, and there has been no insufficiency of process or service of process.

## FACTS

**A.**   **Summary of Mr. Speaker's Private Medical History**

9.

In January 2007, Plaintiff Andrew Speaker was a 31-year-old, self-employed attorney who was engaged to be married and who was, by all appearances, in good health.

10.

On or about January 4, 2007, Mr. Speaker saw his primary care physician about that he was experiencing in his left ribcage area.

11.

Mr. Speaker's doctor ordered radiographic imaging of his chest, which was performed on or about January 8, 2007.

12.

The chest imaging revealed a mass in Mr. Speaker's right lung that did not appear to be related to his left-sided rib pain.

13.

Multiple blood work was done on January 10, 2007, and Mr. Speaker was given a tuberculin skin test that was read as negative.

14.

On January 18, 2007, a CT scan of the chest revealed a reticular-nodular infiltrate in the apical and posterior segments of the right upper lobe, with individual nodules measuring up to 9mm in size and one nodule containing a small central cavity, which was suggestive of tuberculosis (TB).

15.

Mr. Speaker's primary care physician referred him to a pulmonary specialist who evaluated him on January 31, 2007. Finding that Mr. Speaker was asymptomatic and had no sputum production, the pulmonologist noted that Mr. Speaker had spent several weeks in Vietnam and Cambodia during the previous year, and he had also traveled to South America in the past 5 years, where he could have come into contact with the bacteria that causes TB. He was prescribed an antibiotic that was to be followed up by re-imaging.

16.

Mr. Speaker was given a second tuberculin test that was read by the pulmonologist as being positive for TB on or about March 2, 2007, although Mr. Speaker continued to have no TB symptoms.

17.

On March 5, 2007, a high-resolution CT scan revealed upper lobe abnormalities with a tree and bud appearance, associated cavitary lesions, and pleural thickening, which was consistent with a pulmonary infection such as TB.

18.

On March 8, 2007, Mr. Speaker underwent a bronchoscopy at Northside Hospital in Atlanta. Bronchoalveolar lavage (BAL) washings of the right upper lobe were collected before and after 5 biopsies from the apical and posterior segments of the right upper lobe. The BAL washings were negative for acid-fast bacilli (AFB), as were the lung biopsies. Pathologic examination of the lung issue showed "focal nonnecrotizing granulomatous inflammation."

19.

On March 26, 2007, the hospital laboratory that tested the biopsy specimens reported that Mycobacterium tuberculosis complex was isolated after 18 days of

incubation of the post-biopsy BAL fluid, with a small number of TB bacteria being found in his lung secretions.

20.

Upon receiving the report from the hospital lab on or about March 26, 2007, the pulmonologist contacted Mr. Speaker, who agreed to begin drug therapy for tuberculosis that consisted of a standard 4-drug regimen of isoniazid, rifampin, pyrazinamide and ethambutal.

21.

Mr. Speaker was also referred to an infectious disease specialist for a second opinion in light of the possibility that Mr. Speaker had contracted tuberculosis outside the United States from an organism that might be more drug-resistant than local strains. Mr. Speaker was evaluated by the infectious disease doctor on or about March 28, 2007.

22.

On April 10, 2007, the Georgia Public Health Laboratory (GPHL) obtained the Mycobacterium tuberculosis isolate from the hospital laboratory in order to perform drug-susceptibility testing. The culture sample contained little bacterial growth and had to be reincubated, indicating that the organism was not prolific and suggesting that Mr. Speaker was not contagious.

23.

On April 16, 2007, the hospital laboratory reported that Mycobacterium tuberculosis complex was isolated after 39 days incubation of the pre-biopsy BAL fluid, and on the following day, April 17, 2007, the hospital laboratory reported that Mycobacterium tuberculosis complex was isolated after 40 days incubation of the biopsy tissue, meaning that these longer term cultures from the March sampling had also tested positive for the presence of TB bacteria.

24.

On or about April 23, 2007, one of Mr. Speaker's doctors referred him to the Fulton County Health Department's Tuberculosis Program because Mr. Speaker had tested culture-positive for TB.

25.

Mr. Speaker presented himself to the Fulton County Tuberculosis Program (hereafter "the TB program") as a new patient on or about April 25, 2007. The physician who evaluated Mr. Speaker was Dr. Andy Vernon, who was Chief of the Clinical and Health Systems Research Branch in the Division of Tuberculosis Elimination (DTBE) at the CDC in addition to being involved in the county TB program.

26.

At all times relevant herein, Mr. Speaker took his drug regimen daily, and he complied with all recommendations of his doctors as well as the public health officials involved in his care.

27.

Meanwhile, Mr. Speaker had informed his doctors, as well as the public health officials involved in his care, that he and his fiancé had made plans to get married in May at a ceremony being held outside the United States that would involve international travel by commercial airline.

28.

During the April 25, 2007 visit to the Fulton County TB program, Mr. Speaker was asked about people with whom he had come in contact, and he provided an induced sputum sample. During this visit, he specifically informed the CDC's Dr. Vernon of his wedding travel plans, and an expedited susceptibility testing of the isolate culture was requested because of his upcoming trip.

29.

On April 26, 2007, Dr. Vernon called Dr. Bob Cooksey, a CDC microbiologist in the Mycobacteriology Laboratory in the Division of Tuberculosis Elimination (DTBE) who also happened to be the father of Mr. Speaker's fiancé.

Dr. Vernon told Dr. Cooksey that he was on the medical staff at Grady Hospital and had consulted on Mr. Speaker's case, and they agreed to have Mr. Speaker's fiancé (Dr. Cooksey's daughter) manage his drug therapy.

30.

On April 26, 2007, Dr. Beverly Metchock, a CDC employee who was the diagnostic Team Leader at the DTBE Mycobacteriology Laboratory, became aware of Mr. Speaker's positive TB culture and offered to expedite testing by obtaining the isolate directly from the State Lab.

31.

On April 26, 2007, the Georgia Public Health Laboratory processed the April 25, 2007 induced sputum sample collected at the Fulton County Tuberculosis Program. The sputum sample was smear negative, meaning that it was examined under a microscope and found to contain no TB bacteria.

32.

On April 27, 2007, at the request of Dr. Vernon, Dr. Metchock picked up the Mycobacterium tuberculosis culture and the isolate from the March 8, 2007 BAL so that further analysis could be done by the CDC.  The isolate was then given to Dr. Cooksey to make a DNA preparation.

33.

On April 30, 2007, the BACTEC 960 susceptibility inventory at the Georgia Public Health Laboratory showed resistance to isoniazid (INH) and rifampin (RIF), which are referred to as first line drugs. These preliminary susceptibility test results indicate multi-drug resistant TB (MDR-TB). The test result was called into Dr. Andy Vernon, the CDC employee on loan to the Fulton County Health Department.

34.

On May 1, 2007, Mr. Speaker was taken off all of the standard first line TB treatment drugs by his doctor, who had received a verbal report from the State Lab that there was growth in both the presence of rifampin and isonizaid, reflecting a diagnosis of MDR-TB. The doctor also spoke with the CDC lab that morning about an additional test that would be ready on May 4, 2007. The doctor's notes clearly stated that there was no evidence indicating that Mr. Speaker was infectious.

35.

On or about May 2, 2007, the Georgia State Lab issued a report concluding that Mr. Speaker had multi-drug resistant TB (MDR-TB) based upon the fact that the sample was resistant to isoniazid and rifampin.

36.

Also on or about May 2, 2007, the CDC lab found an ropB mutation, suggesting resistance to all rifamycins (ie., rifampin and others), and a pncA mutation, indicating resistance to pyrazinamide.

37.

On May 3, 2007, Dr. Vernon sent an email from his CDC email address to a doctor that he was consulting in Florida on drug therapy options, with copies of that email being sent to Dr. Ken Castro (Director of the CDC's Division of Tuberculosis Elimination) and Dr. Cooksey at their CDC email addresses.  In the email entitled "More issues with our MDR patient in Atlanta," Dr. Vernon discussed the CDC lab reports and asked the following question about the proposed drug regimen:  "Would it be MOXI+EMB+CYC+CAP injectable when he is here (*before and after his trip)*?" (emphasis added).

38.

The reference to Mr. Speaker's upcoming trip confirms that CDC officials were not only aware of Mr. Speaker's travel plans, at the highest levels, but were planning their treatment options, and advising Mr. Speaker accordingly, around the trip — in stark contrast to the CDC's later claims to the media that they were unaware of Mr. Speaker's travel plans.

39.

On May 3, 2007, the CDC lab conducted an agar proportion drug-susceptibility test on the BAL isolate. The molecular testing in the CDC lab showed no gyrA mutation, indicating no resistance to quinolone antibiotics (ie. ciprofloxacin, ofloxacin, levofloxacin, and moxifloxacin).

40.

On or about May 3, 2007, Mr. Speaker was told by his doctor at the Fulton County TB program that his case of MDR-TB would be best handled at the National Jewish Medical and Research Center in Denver, Colorado. Mr. Speaker was also told that it would be several weeks before a bed would be available for Mr. Speaker in Denver. During this time Mr. Speaker was under no physical restrictions, and was able to visit family and friends and engage in the practice of law.

41.

Mr. Speaker then reminded the doctor about his wedding travel plans outside the United States, including the fact that the planned departure date was May 14, 2007.

42.

Also on or about May 3, 2007, Dr. Cooksey emailed Dr. Vernon about Mr. Speaker's MDR-TB diagnosis and the upcoming overseas trip, and Dr. Vernon responded with an email to Dr. Cooksey, with a copy to Director Castro, stating that he understood the Speakers would be traveling overseas and that Mr. Speaker would begin treatment at the National Jewish Medical and Research Center in Denver upon their return to the United States. This email was copied to Defendant Admiral Castro at the CDC.

43.

On May 4, 2007, the Georgia Public Health Laboratory (GPHL) finished its susceptibility test results on the culture from the BAL specimen, which indicated that Mr. Speaker had MDR-TB. The GPHL reported the results to the CDC's Dr. Vernon as well as state public health officials, stating that additional susceptibility testing would be done on May 7, 2007 to confirm the resistant results.

44.

On May 7, 2007, the GPHL reported that the BACTEC 960 inventory was checked. The repeated susceptibility tests showed the same results as the first susceptibility test results plus resistance to 0.4 INH and streptomycin, again

14

indicating that Mr. Speaker had MDR-TB.  These results were also reported to Dr. Vernon and state health officials.

45.

There was nothing in the GPHL susceptibility results that indicated that Mr. Speaker had a more highly resistant strain of TB known as XDR-TB, or extensively drug resistant tuberculosis.

46.

On May 7, 2007, the CDC lab's own molecular testing showed an embB mutation, indicating resistance to ethambutal.  Then on May 8, 2007, CDC molecular testing showed 16s rRNA , with no mutation.  Both of these findings, which were consistent with MDR-TB rather than XDR-TB, were verbally reported to Dr. Vernon.

47.

On or about May 9, 2007, DNA sequencing of Mr. Speaker's sample was completed by Glenn Morlock at the CDC, and again there were no mutations found that would represent anything other than MDR-TB, with the result being that there was no evidence that Mr. Speaker had XDR-TB.

48.

On or about May 9, 2007, the GPHL's repeated susceptibility tests indicated MDR-TB, not XDR-TB.

49.

On or about May 10, 2007, Mr. Speaker, his fiancée, his father, and his future father-in-law (the CDC's Dr. Cooksey), met with Mr. Speaker's private doctor and his doctor at the Fulton County TB program.

50.

The purpose of this meeting was to confirm Mr. Speaker's wedding travel plans and to discuss Mr. Speaker's future medical care at the National Jewish Center upon return to the U.S. following the wedding.

51.

At the meeting, Mr. Speaker was repeatedly advised by the Fulton County TB program doctor that he was not contagious, that he was not a threat to his fiancé or anyone else, that he was not putting anyone in harm's way, and that he was not going to infect a planeload of people.

52.

After the meeting of May 10, 2007, Mr. Speaker was never told by any doctor or public health official that he should not travel abroad, even though his

doctors and officials of both the CDC and the Fulton County Health Department were aware of Mr. Speaker's plans to leave the country in the next few days.

53.

Having met with his doctors and being told that he was not contagious, Mr. Speaker decided to leave for Europe on May 12, 2007 rather than May 14 in order to make preparations for the wedding.  He arrived in Paris on May 13 and met his fiancé on May 14, 2007 with plans to be married in Greece.

54.

On May 14, 2007, the CDC lab recorded that a preliminary read of the BAL drug susceptibility testing showed resistance to isoniazid and rifampin, probable resistance to streptomycin, and the MGIT test showed pyrazinamide resistance.

55.

On May 16, 2007, the GPHL recorded culture results of the induced  sputum specimen that had been collected at the Fulton County TB program on April 25, 2007.  The acid-fast bacilli (AFB) was identified as Mycobacterium tuberculosis complex.  The CDC's Dr. Vernon and another doctor working at the county TB program were called about the results.

56.

Dr. Vernon noted in Mr. Speaker's medical records at the Fulton County TB program that the April 25th sputum culture was positive and that he would attempt to notify the patient.

57.

On May 17, 2007, Dr.Vernon called Dr. Metchock at the CDC and informed her that the induced sputum from the April 25th culture was positive.

58.

On May 18, 2007 at 11:02 a.m., David Sikes, Microbiologist in the CDC's Mycobacteriology Lab, which had performed the agar proportion drug-susceptibility testing on the BAL isolate, reportedly emailed Dr. Metchock, his immediate supervisor, and stated that there was something questionable about the preliminary results of that testing.   Dr. Metchock recorded that the preliminary read of BAL drug susceptibility testing looked suspicious and she called Dr. Vernon.

59.

Based upon this alleged suspicion about the results of a single preliminary test, the CDC apparently decided to reclassify Mr. Speaker's tuberculosis as XDR-

TB rather than MDR-TB, despite the fact that all other test results indicated MDR and were inconsistent with the XDR diagnosis.

60.

Four days later on May 22, 2007, the CDC microbiologist David Sikes filled out and initialed a worksheet, entitled "Centers for Disease Control and Prevention Diagnostic Mycobacteriology Section Antimicrobial Susceptibility Testing Worksheet." In addition to being initialed by Mr. Sikes, it was initialed as having been read by the CDC's Dr. Metchock. The worksheet recorded the preliminary results of the agar proportion drug-susceptibility testing of the BAL isolate, which was inoculated to broth in the CDC lab on April 27, 2007 and inoculated to plate on May 3, 2007. The worksheet stated that the preliminary results met the criteria for XDR-TB by showing resistance to isoniazid, rifampin, a quinolone (ie., ciprofloxacin and ofloxacin), and a second-line injectable drug (kanamycin).

61.

The worksheet also stated that the preliminary results were in the process of being confirmed by repeat testing to follow with a final report. To date the CDC has not provided the results of the repeat testing or the final report of the initial testing despite multiple requests under the Freedom of Information Act.

62.

Specifically, the CDC has not provided the following:

- The CDC has not, for unexplained reasons, provided the results of any final testing and the QC standards used for those lab test results.

- The CDC had two specimens from Mr. Speaker, a March 8, 2007 BAL Specimen and an April 25, 2008 induced sputum culture. Again, with regard to both samples, for unexplained reasons, no agar proportion drug-susceptibility testing results have been provided.

- The CDC has not provided the quality control documentation (required under CLIA Sec. 493.1262 Standard Mycobacteriology)[1] for each and every drug susceptibility test it performed on each and every culture tested from Mr. Speaker.

63.

On May 22, 2007, the CDC's Dr. Metchock recorded the agar proportion drug-susceptibility testing as showing that Mr. Speaker had XDR-TB.

64.

The CDC's alleged preliminary test results resulting in the May 18 to May 22, 2007 re-diagnosis of XDR-TB rather than MDR-TB, which were inconsistent

---

[1] Under the Clinical Laboratories Improvement Act (CLIA), quality control standards have been established for all laboratories that perform human biological testing. 42 U.S.C.§263a.

with the findings of all other drug susceptibility testing conducted before or since, was an unverifiable false result that was probably due to laboratory error. In any event, it was a preliminary finding that should have been described as such and that should not have been the basis for a change in diagnosis.

65.

Based upon the erroneous preliminary finding that Mr. Speaker had XDR tuberculosis when he in fact had the MDR strain, the CDC made efforts to contact him. While the CDC has contended in testimony before Congress that it began trying to contact Mr. Speaker on May 18, there is no evidence that any such contact was attempted between the 18th and the 22nd because both the Speakers and the Cookseys—one of whom worked for the CDC—were together in Greece for the wedding and were accessible by email and cell phone, yet no calls or emails were received from anyone affiliated with the CDC during that four-day period.

66.

By May 22, 2007, Dr. Cooksey had returned to the United States after his daughter's wedding to Mr. Speaker, and on that date he learned for the first time that Mr. Speaker's tuberculosis had allegedly been reclassified four days earlier. Dr. Cooksey immediately relayed a message to Mr. Speaker, who was now

honeymooning in Italy with Dr. Cooksey's daughter, that the CDC was trying to reach him because of the alleged change in his diagnosis.

67.

Mr. Speaker immediately made a late night call from Rome to the CDC. The CDC employee, Dr. David Kim, told Mr. Speaker that Mr. Speaker's diagnosis had changed from MDR-TB to XDR-TB, but this only affected his treatment options and not his contagious status, which Mr. Speaker had been told repeatedly was non-contagious. Nonetheless, the CDC would not permit him to return home via commercial airline.

68.

During the May 22 phone conversation, Dr. Kim told Mr. Speaker that the CDC was making arrangements to fly him back to the United States, and they made an appointment to talk again the following day.

69.

The next day, May 23, 2007, Mr. Speaker again spoke with the CDC's Dr. Kim by telephone. This time Dr. Kim told him that there was no money in the CDC's budget to pay for air travel for private citizens, and that Mr. Speaker and his fiance' were "on their own" if he intended to return to the United States for treatment. Mr. Speaker would either have to charter a private flight to the United

22

States or check into the Italian hospital the following day. Dr. Kim suggested that Mr. Speaker go out for the evening to "get some fresh air" and consider his options over dinner with his fiance´. Although Dr. Kim asked Mr. Speaker to go into voluntary quarantine the next day, he also told Mr. Speaker that he was free to wander around Rome that night without mentioning any possible risk of exposing his fiance´ or others to the extensively drug resistant disease that he supposedly had.[2]

70.

Because Mr. Speaker had been told that his best treatment option would be at the National Jewish Medical and Research Center in Denver, he researched the option of chartering a private flight. He learned that his health insurer would not cover the cost of a chartered flight that could cost as much as $140,000, and Mr. Speaker could not afford to pay for such a flight.

---

[2] While Mr. Speaker and his fiancé did exchange vows at a marriage ceremony in Greece, the marriage was never officially recognized because they separated before the marriage license could be filed, so Mr. Speaker's bride-to-be will continue to be identified herein as his fiancé rather than his wife. Tragically, their relationship was unable to withstand the rigors of Mr. Speaker's subsequent quarantine and the trauma of the public vilification that resulted from the CDC's unlawful disclosure of Mr. Speaker's identity and private health information to the world media.

71.

Given a choice between spending $140,000 he did not have or spending two years in a foreign hospital, Mr. Speaker and his fiancé decided to fly into Canada and rent a car to drive the rest of the way home for treatment.

72.

At the time Mr. Speaker boarded the plane for Canada, there was not a "no fly" order or other legal prohibition in effect that prohibited him from flying to Canada or anywhere else.

73.

After landing in Montreal and legally crossing the United States-Canada border in upstate New York, Mr. Speaker called the CDC on May 24 or 25, 2007 to let them know that he was back in the United States and was ready to begin treatment.  He was asked to drive himself to Bellevue Hospital in New York City for further testing, which he agreed to do.

74.

When Mr. Speaker arrived at Bellevue Hospital as promised, he was served with a federal quarantine order, the first such order since 1963, in which the CDC directed Bellevue officials hold Mr. Speaker in provisional quarantine for 72 hours.

The order listed the test results upon which his alleged XDR-TB diagnosis was based, but none of the listed test results actually supported a diagnosis of XDR-TB.

75.

On or about May 25, 2007, while under the care of Bellevue Hospital, Mr. Speaker was given three sputum tests, all of which were negative.

76.

On or about May 28, 2007, officials of the CDC and the Georgia Department of Health and Wellness informed Mr. Speaker that he was to   be taken to Atlanta via plane for further treatment.  Upon arrival in Atlanta, Mr. Speaker was served with another federal isolation order under which he was kept at Grady Hospital for two days and subsequently was to be moved to Denver for treatment at the National Jewish Center.

77.

Just as they had told him when he was trying to return to the United States from Italy, the CDC told Mr. Speaker that they were not able to pay for his transportation to Denver, and they suggested that Mr. Speaker drive to Denver and stay in hotels along the way without telling him to avoid contact with others.   Mr. Speaker was in the process of planning his road trip and making hotel reservations

when his health insurer agreed to cover the cost of an air ambulance flight to Denver.

78.

Mr. Speaker ended up spending two more months in quarantine in Denver, where he had lung surgery and eventually made a full recovery from his MDR-TB.

79.

At no time did any of Mr. Speaker's treating doctors at the National Jewish Center or elsewhere diagnose him with XDR-TB.

**B.**     **Facts Supporting Claim Under Privacy Act**

80.

Paragraphs 1 thru 79 are hereby incorporated by reference as if fully set forth herein.

81.

At all times relevant herein, the CDC has maintained a system of records containing personally identifiable information about Mr. Speaker, including but not limited to items of information collected by the CDC relating to Mr. Speaker's medical history and his testing and treatment for tuberculosis.

82.

In May, June and July of 2007, the CDC caused personally identifiable information about Mr. Speaker to be improperly disclosed without his consent to law enforcement officials, the news media, and the general public as a result of the deliberate actions of the CDC and its employees or agents.

83.

Said disclosure of Mr. Speaker's personally identifiable information occurred as follows:

a)   Public disclosures to the international news media during press conferences and interviews held on or about May 29 and 30, June 1, and July 3 and 11, 2007;

b)   Upon information and belief, other disclosures by CDC agents or employees to members of the media during the time frame of said public press conferences and interviews, including but not limited to information that enabled the media to ascertain Mr. Speaker's identity and whereabouts on or about May 29, 2007 and to publish his name on and after May 31, 2007;

c)   Upon information and belief, disclosure of Mr. Speaker's identity to law enforcement officers who in turn leaked his identity to the Associated Press between May 29 and 31, 2007;

d)      Upon information and belief, confirmation of Mr. Speaker's identity to the

Associated Press between May 29 and 31, 2007;

e)      Upon information and belief, other disclosures made as part of a media

campaign directed toward Mr. Speaker and his disease that will be identified

through discovery and proven at trial.

84.

In making the aforementioned disclosures about Mr. Speaker, the CDC

announced to the world that an alleged XDR-TB patient had traveled on

transatlantic flights, but the CDC's announcements did not disclose the fact that

Mr. Speaker had been told he was sputum negative and non-contagious, that the

alleged XDR diagnosis was based on preliminary test results that were contradicted

by other findings that he in fact had a less drug-resistant strain of tuberculosis

called MDR-TB, and that CDC officials had advance knowledge of Mr. Speaker's

travel plans and had even planned his treatment around the trip, thereby presenting

the facts in a false light that subjected Mr. Speaker to public criticism and forced

him to defend the false allegations being made against him.

85.

During the aforementioned press conferences and at other times during the

course of the aforementioned media campaign, the CDC unnecessarily and

28

unlawfully released details of Mr. Speaker's medical history and his alleged medical condition (including the dissemination of a detailed timeline of his medical treatment), the fact that he had flown to Greece to get married, and the fact that he was a lawyer in Atlanta, all of which would have allowed him to be readily identified even if his identity had not been directly disclosed by the CDC, when there was no need for his identity or the private details of his life to be a matter of public knowledge in order to accomplish any legitimate public health purpose.

86.

While the CDC was warning the world of the extreme threat that Mr. Speaker allegedly posed to the public, the CDC was simultaneously advising Mr. Speaker that he would have to drive himself to Denver, Colorado with his fiance' so that he could receive the proper medical care.

87.

The publicity surrounding the CDC's release of this information was sufficient to attract the interest of Congress, and on or about June 6, 2007 a committee of the United States Senate chaired by Senator Grassley held an investigative hearing into the events that had brought such unwanted international attention to Mr. Speaker.

88.

Dr. Julie Gerberding, who was then Director of the CDC, testified before the Senate committee on June 6, 2007 that there had been several mistakes made in connection with Mr. Speaker's case.

89.

When Director Gerberding testified that the CDC had been unable to fly Mr. Speaker from Italy to the United States by private plane due to safety concerns for the pilots, Senator Harkin responded that her testimony "did not hold a lot of water" given the CDC's apparent lack of concern about the issue when they flew Mr. Speaker from New York to Atlanta.

90.

Director Gerberding also testified before the Senate committee that Defendant CDC did not learn of Mr. Speaker's travel plans before May 18, 2007, which is contradicted by numerous communications between Mr. Speaker, the Fulton County Health Department, and even emails between CDC officials.

91.

Defendant Gerberding further testified at the June 6, 2007 Senate committee hearing that "on May 22, our laboratory determined the patient actually had

extensively drug resistant TB" [XDR]—a date which the CDC changed in later public statements to May 18, 2007.

92.

On or about June 15, 2007, Mr. Speaker was first informed that all drug susceptibility testing of his TB strain were indicating a diagnosis of MDR—not the XDR diagnosis allegedly made by the CDC on May 18 or 22, 2007.

93.

On June 25, 2007, the Mycobacteriology Clinical Reference Laboratory at the National Jewish Medical Research Center issued a report on the testing of two isolates from Andrew Speaker: a Georgia Health Public Health Laboratory isolate collected April 25, 2007 and a National Jewish isolate collected June 1, 2007. These isolates underwent drug-susceptibility testing by three different methods: 1) minimal inhibitory concentration (MIC) determination in liquid media Bactec 7H12 broth; 2) proportion method using 7H11 agar plates; and 3) proportion method using HSTB agar plates. Both cultures showed definite resistance to three drugs: isoniazid, rifampin, and pyrazinamide by testing with any of the above described methods, without any discrepancy. A borderline level of susceptibility (defined as "moderate susceptibility") is detected in some studies with streptomycin and ethambutal. Both isolates were fully susceptible by all methods

to all quinolones (moxifloxacin, ofloxacin, levofloxacin, ciprofloxacin), to linezolid, and to all injectable second line drugs (AD, KM, CM), ETA, PAS, CF). The report concluded by stating that the isolates should not be classified as XDR but instead MDR due to their resistance to first-line drugs only. Comparison of results obtained with the two isolates indicated that the drug susceptibility/resistance pattern did not change during the period between April 25, 2007 and June 2, 2007.

94.

On July 3, 2007, the CDC and the National Jewish Medical and Research Center held a joint press conference, entitled "Update on Tuberculosis Case in an International Traveler." Despite the title of the press conference, Mr. Speaker was again identified by name to the world media, again resulting in the unauthorized and unlawful disclosure of identifiable private medical information. At the press conference, the CDC's Dr. Mitchell Cohen announced that Mr. Speaker's diagnosis was now MDR-TB rather thanXDR-TB.

95.

In an effort to explain the inconsistency of Mr. Speaker's test results with what had been publicly released by the CDC, the CDC's Dr. Cohen stated that the CDC's testing had confirmed that Mr. Speaker's predominant TB bacteria was

MDR-TB, and he further stated that Mr. Speaker might have a small number of XDR bacteria--falsely implying that it was possible to have both strains at the same time. Dr. Cohen also stated at the July 3 press conference that the reason the CDC and the National Jewish Center had obtained different results was because the CDC had the "Gold Standard" of testing while National Jewish did not, but in fact, both facilities had used the same testing methods for the same tests.

96.

Dr. Cohen also stated at the July 3 press conference that the original bronchoscopy sample showing alleged XDR-TB was no longer available for retesting. This statement is inconsistent with federal testing standards requiring that such samples be retained, and in any event the CDC has given no explanation for the alleged unavailability of the sample.

97.

On July 9, 2007, the CDC lab printed out an electronic form with the official results of the drug susceptibility testing of the bronchoalveleolar lavage fluid on Andrew Speaker. The report status was listed as "preliminary" and reviewed by Dr. Beverly Metchock. Repeat testing showed that the original BAL isolate did not show resistance to quinolone drugs or to any second-line injectable drugs. The

repeat testing demonstrated MDR-TB.  The record states the final report was to follow, but the CDC has never produced a final report to Mr. Speaker.

98.

On July 11, 2007, the CDC held another press conference at which identifiable medical information about Mr. Speaker was released to the public.

99.

On July 17, 2007, Mr. Speaker underwent surgery at University of Colorado Hospital to remove the diseased portion of the right upper lobe.  On July 18, 2007, the lung tissue was received for culture at the Mycobacteriology Clinical Reference Laboratory at the National Jewish Medical and Research Center.

100.

On or about July 26, 2007, Mr. Speaker was released from the National Jewish Center after continued findings of negative culture growth.

101.

On September 14, 2007, the Mycobacteriology lab at the National Jewish Center identified Mycobacterium tuberculosis complex from lung tissue obtained on July 17, 2007.

102.

On November 14, 2007, a doctor at the National Jewish Center noted that the drug-susceptibility test results on the lung tissue totally ruled out the possibility that any of the organisms from Andrew Speaker's lung were XDR-TB.

103.

In or around the month of December 2007, Defendant CDC received a substantial increase in additional funding from Congress for TB research, accomplished by a congressional bill that the CDC had been promoting for the past decade. This funding initiative was passed as a result of the CDC's diagnosis of Mr. Speaker as having XDR-TB and the worldwide attention attracted by the CDC's highly publicized release of Mr. Speaker's private information.

## THEORY OF RECOVERY

104.

Paragraphs 1 through 103 are incorporated by reference as if fully set forth herein.

105.

At all times relevant herein, the Defendant CDC maintained a system of documents and records containing sensitive private information, including medical

history and other protected health information, identifiable to specific individuals including the Plaintiff, Andrew Speaker.

106.

The aforementioned disclosures by the Defendant CDC about Plaintiff Andrew Speaker and his status as a tuberculosis patient resulted in the release of private identifiable information contained in said system of records, including Mr. Speaker's medical history and other protected health information, the confidentiality of which is which is mandated by the Privacy Act (5 U.S.C. §552a), the Health Insurance Portability and Accountability Act ("HIPAA," 42 U.S.C. §1320d et seq), and other applicable law.

107.

Said release of Mr. Speaker's identifiable private information was unauthorized by law, done without his consent, and was not permitted by any of the enumerated exceptions of 5 U.S.C. §552a(b).

108.

The identifiable private information that the Defendant released about Mr. Speaker, including but not limited to his identity, his occupation, his city of residence, his wedding travel plans, his medical history, and his present medical

status, went far beyond the reasonable scope of what was arguably necessary for the protection of public health.

109.

The aforementioned unauthorized disclosures of Mr. Speaker's identifiable private information were not made "pursuant to a showing of compelling circumstances affecting the health or safety of an individual if upon such disclosure notification is transmitted to the last known address of such individual" in compliance with the exception set forth in 5 U.S.C. §552a(b), not only because of the lack of the required disclosure notification with regard to the May 29, 2007 press conference and other public communications but because there was a complete lack of compelling circumstances sufficient to override Mr. Speaker's privacy interests in not having his identity, his occupation, his city of residence, his wedding travel plans, his medical history, and his present medical status a matter of public knowledge throughout the world.

110.

Said unauthorized disclosures of Mr. Speaker's identifiable private information by a federal agency charged with the responsibility of maintaining the confidentiality of that information constituted a violation of the Privacy Act, 5 U.S.C. §552a.

111.

At all times relevant herein, the CDC acted willfully and intentionally in connection with the aforementioned disclosures.

112.

Whether true or untrue, the CDC's intentional, unauthorized disclosure of Mr. Speaker's identifiable private information caused significant actual harm to Mr. Speaker and his reputation, thereby entitling Mr. Speaker to pursue an action for damages against the CDC under 5 U.S.C. §552a(g)(1)(D) and g(4).

**DAMAGES**

113.

Paragraphs 1 thru 112 are hereby incorporated by reference as if fully set forth herein.

114.

As a sole, direct and proximate result of having his identifiable private information released to the world media by the CDC, Plaintiff Andrew Speaker became the object of unwanted public attention, including expressions of public scorn and contempt (including death threats) due to the inaccurate light in the information presented, resulting in so much strain on his marital relationship that he and his new bride parted ways after the wedding but before filing their marriage

license, causing him to suffer both pecuniary and non-pecuniary losses, none of which would have occurred had the CDC complied with its statutory duties and not released details that identified Mr. Speaker.

115.

As a sole, direct and proximate result of having his identifiable private information released by the CDC, Plaintiff Andrew Speaker suffered damage to his personal and professional reputation that had a substantial economic and noneconomic impact upon his livelihood, causing his name to surface in connection with the CDC's disclosures any time a prospective client does an online search for information about him, resulting in both pecuniary and non-pecuniary damages that would not have occurred had the CDC complied with its statutory duties and not released details that identified Mr. Speaker.

116.

As a sole, direct, and proximate result of the unauthorized and unlawful conduct of the CDC, Mr. Speaker has been forced to endure grave mental anguish and emotional distress, and has suffered considerable economic and non-economic damage to his personal and professional reputation, which are all items of actual damages for which the Defendant CDC is liable to Plaintiff Speaker in an amount

to be proven at trial and determined by the enlightened conscience of fair and impartial jurors.

117.

In addition to being entitled to recover any and all actual damages proximately caused by the Defendant, Plaintiff Speaker is also entitled to recover attorney's fees and expenses of litigation under 5 U.S.C. §552a(g)(4) (A) and (B) in an amount to be proven at trial.

WHEREFORE the Plaintiff demands the following:

A)    That this action be tried to a jury;

B)    That judgment be entered in favor of the Plaintiff and against the Defendant for actual damages in an amount to be determined by the enlightened conscience of fair and impartial jurors;

C)    That Plaintiff be awarded reasonable attorney's fees and litigation expenses;

D)    That all costs of this action be taxed against Defendant; and

E)    That the Court award any additional or alternative relief as may be appropriate under the circumstances.

A JURY TRIAL IS DEMANDED.

Respectfully submitted this 31st day of August, 2009.

PAGE PERRY, LLC

*/s/ Craig T. Jones*
_____
CRAIG T. JONES
Georgia Bar No. 399376
Attorney for Plaintiff

1040 Crown Pointe Parkway
Suite 1050
Atlanta, Georgia  30338
(770) 673-0047